IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CHRISTOPHER H. WEST, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 13-2103 (MN) |
| | ) |
| MARK EMIG and JEFFREY CARROTHERS, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

Stephen A. Hampton, GRADY & HAMPTON, LLC, Dover, DE; Nicholas Casamento, Joseph A. Ratasiewicz, CASAMENTO & RATASIEWICZ, P.C., Media, PA – Attorneys for Plaintiff.

Stuart B. Drowos, Kenneth L. Wan, Deputy Attorneys General, STATE OF DELAWARE DEPARTMENT OF JUSTICE, Wilmington, DE – Attorneys for Defendants.

March 31, 2021
Wilmington, Delaware

**NOREIKA, U.S. DISTRICT JUDGE:**

Pending before the Court is the renewed motion for summary judgment filed by Defendants Mark Emig ("Emig") and Jeffrey Carrothers ("Carrothers") (collectively, "Defendants") (D.I. 84). The motion is opposed by Plaintiff Christopher H. West ("Plaintiff" or "West"). (D.I. 88). In evaluating this motion, the Court has reviewed the parties' briefing, (D.I. 85, 88, 92), the concise statements of facts submitted by both parties (D.I. 87, 90, 93), and the appendices submitted by both parties, (D.I. 86, 89). Having reviewed these materials and for the reasons set forth below, Defendants' motion is GRANTED-IN-PART and DENIED-IN-PART.

## I.  BACKGROUND

West is a prisoner incarcerated at the James T. Vaughn Correctional Center ("JTVCC") in Smyrna, Delaware. (D.I. 1 at 1). Prior to his incarceration at JTVCC, West was housed at the Howard R. Young Correctional Institution ("HRYCI") in Wilmington, Delaware. (*Id.* at 2-3). On December 30, 2013, West filed a Complaint against Emig, Deputy Warden of HRYCI, and Carrothers,[1] the former Operations Security Superintendent for JTVCC, alleging violations of the Eighth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983 and seeking monetary damages. (*Id.* at 2-3). The Complaint raises issues with West's conditions of confinement when he was denied a mattress at times: (1) between September 2011 and February 2012, while he was incarcerated at HRYCI, and (2) between April 2013 and June 2013, while he was incarcerated at JTVCC. (*Id.* at 3). West alleged in his Complaint that he had exhausted all administrative remedies because he tried to file a grievance twice but was denied, first for being on Psychiatric Close Observation ("PCO") status and then "for time." (D.I. 1 at 2).

---

[1] Both Emig and Carrothers have now retired. (D.I. 87 ¶ 4).

It is undisputed that, after he "exhibited self-injurious tendencies and demonstrated a propensity for eating unusual, inedible non-food items such as pens, pencils, plastic straws, plastic cutlery, batteries, and even bedding materials," (D.I. 69 at 1), West was placed on PCO for at least portions of these time periods. (D.I. 92 at 5; D.I. 86, Exs. H, I; D.I. 86 at A-88). It is also undisputed that there were periods of time when West did not have a mattress. (*See, e.g.*, D.I. 86 at A-10).

Defendants filed a Renewed Motion for Summary Judgment on August 20, 2018, in which they argued they were entitled to judgment because (1) Plaintiff failed to exhaust available administrative remedies prior to filing this suit; (2) Plaintiff's claims are barred by qualified immunity; (3) Defendants have no liability in their supervisory capacity; and/or (4) Plaintiff has failed to establish a violation of the Eighth Amendment. (D.I. 66). This Court granted the motion on the exhaustion issue and did not consider the other issues in Defendants' motion. (D.I. 70). West successfully appealed that decision to the Third Circuit, which remanded the case for further proceedings consistent with the appellate decision. *See West v. Emig*, 787 F. App'x 812, 814 (3d Cir. 2019).

After the case was remanded, the parties engaged in limited discovery on the issue of exhaustion. (D.I. 77). After a brief stay due to the COVID-19 pandemic, (D.I. 81), Defendants filed the pending motion on August 21, 2020, in which they renew each of the four grounds in Defendants' prior Motion for Summary Judgment, (D.I. 84). Plaintiff responded on September 22, 2020, (D.I. 88), and Defendants filed their reply brief on October 7, 2020, (D.I. 91).

## II.  LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a).  The moving party bears the burden of demonstrating an absence of a genuine issue of material fact.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986).  The movant can meet this burden by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  If a moving party has sufficiently carried its burden, a nonmovant must "come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita* 475 U.S. at 587.  The Court may not make credibility determinations but must instead "draw all reasonable inferences in favor of the nonmoving party."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as the material facts." *Matsushita*, 475 U.S. at 586.  A factual dispute is only genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Id.*

### III.  DISCUSSION

#### A.  Supervisory Liability

Liability in a 42 U.S.C. § 1983 action is personal in nature, and to be liable, a defendant must have been personally involved in the wrongful conduct. That is to say, a defendant is "liable only for [his] own unconstitutional conduct." *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014), *rev'd on other grounds sub nom. Taylor v. Barkes*, 575 U.S. 822 (2015).  Hence, *respondeat superior* cannot form the basis of liability.  *Evancho v. Fisher*, 423 F.3d 347, 353 (3d

Cir. 2005); *see also Alexander v. Forr*, 297 F. App'x 102, 104-05 (3d Cir. 2008) (constitutional deprivation cannot be premised merely on the fact that the defendant was a prison supervisor when the incidents set forth in the complaint occurred). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

"[T]here are two theories of supervisory liability, one under which supervisors can be liable if they established and maintained a policy, practice or custom which directly caused the constitutional harm, and another under which they can be liable if they participated in violating plaintiff's rights, directed others to violate them, or, as the persons in charge, had knowledge of and acquiesced in their subordinates' violations.'" *Parkell v. Danberg*, 833 F.3d 313, 331 (3d Cir. 2016) (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 129 n.5 (3d Cir. 2010)).

Defendants contend that West has provided no factual or documentary proof to support his allegations that Defendants had supervisory responsibility for the medical and mental health care providers and that West has failed to plead facts alleging that either Defendant was the "moving force" behind West's mental health treatment. (D.I. 85 at 14). West, however, argues that there are genuine issues of material fact as to whether Defendants had supervisory responsibility for the medical providers. The Court agrees with West and will deny summary judgment on this issue.

Both Emig and Carrothers asserted in their respective declarations that they had no active role or oversight responsibility for medical treatment plans. (D.I. 86 at A-12, A-18). Several pieces of deposition testimony, however, suggest that they may have had some ability to override the medical providers' instructions.

In his deposition, Emig testified that any serious medical and mental health issues were discussed at a weekly Multi-Disciplinary Team ("MDT") meeting, which he would either attend

4

or review the minutes of, as was his responsibility. (D.I. 86 at A-129 – A-129). He then stated that if he learned of something which "involved safety to an inmate or concerns about an inmate" he "would have a discussion . . . with the mental health and the medical [providers], as to why they are doing what they are doing with that particular individual." (D.I. 86 at A-129). He testified that if he "saw something in one of these minutes that alarmed [him] to the point where [he] felt it may not be safe for the inmate" he could override that decision and would have the authority to do so. (D.I. 86 at A-130). Similarly, Emig stated that if he saw something that could "run afoul of the bureau of institutional policies, or in any way jeopardize safety, [he] could step in" and that if it were "really bad [he] could override it." (D.I. 86 at A-132). Justin Waltz, who worked at HRYCI, confirmed that his understanding of protocol was that Emig could have ordered that West be given a mattress. (D.I. 86 at A-28). When asked about circumstances similar to those alleged by West, Emig testified that if he saw that the MDT recommended an inmate be without a mattress for three or four weeks, he would "absolutely" scrutinize that treatment plan and that if mental health providers had told him an inmate would be without a mattress for three or four weeks he "would not have accepted that . . . absolutely not." (D.I. 86 at A-130 – A-131, A-136 – A-137).

In Carrothers's deposition, he also suggested he may have had the authority to override certain decisions of medical providers. He testified that if something was concerning to him, he would bring it to the attention of the medical staff, that his responsibility was to verify medical decisions "did not adversely impact on the security and safety of the facility, staff and general inmate population," and that if an inmate were to be deprived of a mattress for several weeks, that could be a safety concern for that inmate. (D.I. 86 at A-148, A-151, A-152). When asked about circumstances similar to those alleged by West, Carrothers testified that if there were a directive from the medical team ordering that an inmate be deprived of a mattress for more than one week,

5

"it would be contested with all of the administrators of the facility because I don't think we would have allowed it."  (D.I. 86 at A-152 – A-153).

Thus, there is a genuine dispute as to whether Defendants could exercise supervisory responsibility for the medical providers.  Accordingly, the Court will deny Defendants' motion for summary judgment on this issue.

### B. <u>Qualified Immunity</u>

The doctrine of qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "[Q]ualified immunity is an immunity from suit, rather than a mere defense to liability." *Hubbard v. Taylor*, 399 F.3d 150, 167 (3d Cir. 2005).  To determine whether qualified immunity applies, the Court asks two questions: "(1) whether the Plaintiff has alleged the violation of an actual constitutional right, and if so, (2) whether the right was clearly established at the time of the alleged violation." *Brockstedt v. Sussex Cty. Council*, 711 F. Supp. 2d 348, 355 (D. Del. 2011); *Torisky v. Schweiker*, 446 F.3d 438, 442-43 (3d Cir. 2006).  The right Plaintiff alleges the official to have violated must have been "clearly established" in a "particularized" sense. *Abdul-Akbar v. Watson*, 4 F.3d 195, 202 (3d Cir. 1993) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  A right is clearly established when "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.*  There need not be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Taylor v. Barkes*, 575 U.S. 822, 135 S. Ct. 2042, 2044 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).  In the Third Circuit, a party asserting the affirmative defense of qualified

6

immunity bears the burden of persuasion at the summary judgment stage. *Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2014). Thus, Defendants must show either that there is no genuine dispute of material fact to refute their contention that they did not violate West's Eighth Amendment rights, or that reasonable officials could not have known that their conduct constituted a violation of his rights when they engaged in that conduct. *Id.*

Defendants argue that because West's claims rest entirely on supervisory liability and there is no evidence to suggest personal involvement on the part of either defendant, it is undisputed that Emig and Carrothers did not personally participate in any alleged violation of West's Eighth Amendment rights. (D.I. 85 at 8-9). As discussed above, however, there is a genuine dispute of material fact as to whether Defendants could exercise supervisory responsibility for the medical providers.

Furthermore, there remain genuine disputes of material fact as to the precise length of the mattress deprivation. Emig denies that West was deprived a mattress for periods of weeks or months at a time between September 2011 and February 2012 and asserts that the only mattress deprivation he remembers was a few days long during mid-October 2011, and that any subsequent removals of West's mattress would have been of similar short duration and only between the hours of 6 a.m. to 10 p.m. (D.I. 86 at A-9 – A-10). Similarly, Carrothers denies that West was ever deprived of a mattress for any extended period, and that any such deprivation would have lasted "perhaps several days at a time" and would only be between the hours of 6 a.m. and 10 p.m. (D.I. 86 at A-17). At his deposition, Carrothers specifically stated that he saw West with a mattress in his cell when he walked past during his 8 a.m. to 4 p.m. shift between April and June of 2013. (D.I. 89 at A-29). On the other hand, Justin Waltz, who worked the 8 a.m. to 4 p.m. shift at HRYCI, (D.I. 86 at A-26, A-28, A-41), testified at his deposition that "there was at least a month or so when

I came in that [West] didn't have [a mattress]," (D.I. 86 at A-36 – A-37). Katrina Burley, who was at the time an Infirmary Housing officer at JVTCC, indicated that West's mattress was removed during daylight hours throughout the three-month period of April to June 2013, (D.I. 86 at A-89), in direct contradiction to Carrothers' testimony. Finally, West himself has submitted an affidavit in which he indicated that more than 90% of the time between September 2011 and February 2012 he had "no mat[tress] at all, suicide or regular. And a point in January [2012], I slept roughly ten days on concrete naked, without suicide prevention smock" and that "[f]rom April of 2013 [through] May of 2013, I . . . had no mat[tress] at all, suicide or otherwise." (D.I. 89 at A-46). Thus, there clearly remain genuine issues of material fact regarding the length of West's mattress deprivation.

Defendants also argue that there was no precedent at the time of the challenged conduct which was sufficiently similar to West's allegations to put them on notice that their conduct might be constitutionally prohibited. (D.I. 85 at 7). Third Circuit case law, however, suggests the opposite.

In *McClure v. Haste*, the court considered a case in which the plaintiff was "effectively deprived a functional mattress" from February 9, 2013 to September 3, 2013 – a period which overlaps with the entirety of West's alleged mattress deprivation at JTVCC – for "no legitimate penological reason." *McClure v. Haste*, 820 Fed. App'x 125, 127, 132 (3d Cir. 2020). The court held that qualified immunity did not apply because "at the time the mattress restriction was in effect, it was clearly established that an inmate could not be effectively deprived a functional mattress for over 200 days, for no legitimate penological reason, particularly where the deprivation caused the exacerbation of his pre-existing back problems." *Id.* at 132. In reaching this holding, the court relied on *Mammana v. Federal Bureau of Prisons*, in which the court held that the

plaintiff's allegations that he "was stripped of his clothing and given only 'paper like' coverings . . . [and] was provided no bedding or toilet paper and only an 'extremely thin mattress' to sleep on" for a period of four days with no penological reason had adequately alleged an Eighth Amendment violation. *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 371, 373-374 (3d Cir. 2019). The *McClure* court noted that "[a]lthough *Mammana* was decided after the events at issue, it broke no new ground and relied upon a considerable amount of well-established case law." *McClure*, 820 Fed. App'x at 132 n.11.

Although neither *McClure* nor *Mammana* mirrors West's allegations exactly, reading the two cases together suggests that West is asserting a constitutional right which was clearly defined in the case law at the time of the alleged violation. West has alleged that between September 2011 and February 2012 and again between April 2013 and June 2013, he was "repeatedly denied a mattress to sleep on." (D.I. 1 at 3). And, as discussed above, there are genuine issues of material fact on this point. These mattress deprivations fall somewhere between the "extremely thin" mattress provided for four days in *Mammana*, 934 F.3d at 371, and the 200-day deprivation of a functional mattress in *McClure*, 820 Fed. App'x at 132, both of which were found to be Eighth Amendment violations.

The remaining question is whether there was a legitimate penological reason for depriving West of a mattress. In both *McClure* and *Mammana*, the mattress deprivations were found to be Eighth Amendment violations because there was no legitimate penological reason underlying them. *See McClure*, 820 Fed. App'x at 132; *Mammana*, 934 F.3d at 373-74. On the other hand, the Third Circuit has held that removing sheets, blankets, and pillows – but not a mattress – from an inmate's cell for thirteen days was not an Eighth Amendment violation when that inmate was coming off a suicide attempt and the removed objects posed a potential risk of harm, thereby

9

providing a legitimate penological reason for their removal. *Coit v. Garman*, 812 F. App'x 83, 87 (3d Cir. 2020). In West's case, there are still genuine disputes of material fact as to whether his mattress deprivation was medically necessary, such that there would have been a legitimate penological reason for it. Emig asserts that any mattress "removals would only have been when prescribed or required by the mental health care provider . . . and based upon his exhibiting appropriate behavior." (D.I. 86 at A-10). Similarly, Carrothers stated that any mattress deprivation "would have been required by a decision of the mental health care provider." (D.I. 86 at A-17). On the other hand, Marc Richman, the former Bureau Chief for the Bureau of Correctional Health Care Services for the Delaware Department of Correction ("DDOC") indicated that while "removal of a mattress for a short period (perhaps up to a week or so) may be appropriate . . . longer periods would not usually be suggested or recommended in the absence of continued exhibited suicidal or self-injurious behavior" and that even during a longer deprivation "a mattress would still be provided during normal sleeping hours." (D.I. 86 at A-23). And neither side has presented a treatment plan made for West in particular. Therefore, there is still a genuine dispute of material fact on this issue.

Thus, the Court finds that Defendants have not met their burden to show either that there is no genuine dispute of material fact to refute their contention that they did not violate West's Constitutional rights, or that the rights he asserts were not clearly defined at the time of the alleged violation. Therefore, Defendants' motion for summary judgment on the issue of qualified immunity will be denied.

   C.  **<u>Failure to Exhaust Administrative Remedies</u>**

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner

confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The requirement for exhaustion of administrative remedies is absolute, except when such a remedy is unavailable. *See Ross v. Blake*, --- U.S. ---, 136 S. Ct. 1850, 1856 (2016) ("[T]he remedies must indeed be 'available' to the prisoner. But aside from that exception, the PLRA's text suggest no limits on an inmate's obligation to exhaust – irrespective of any 'special circumstances.'"). Failure to exhaust administrative remedies is an affirmative defense that must be pleaded and proved by a defendant. *Ray v. Kertes*, 285 F.3d 287, 295-96 (3d Cir. 2002).

Exhaustion of administrative remedies requires that "a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bring suit in federal court." *Woodford v. Ngo*, 548 U.S. 81, 88 (2006). A prison's administrative review and grievance procedures "'supply the yardstick' for determining what steps are required for exhaustion." *Williams v. Beard*, 482 F.3d 637, 639 (3d Cir. 2007) (quoting *Spruill v. Gillis*, 372 F.3d 218, 231 (3d Cir. 2004)). Perfect overlap between grievance and a complaint is not required, but there must be a shared factual basis from the two. *See Jackson v. Ivens*, 244 Fed. App'x. 508, 513 (3d Cir. 2007) (unpublished) (citing *Woodford*, 548 U.S. at 95).

The failure-to-exhaust affirmative defense has two distinct stages. *West v. Emig*, 787 F. App'x 812, 814 (3d Cir. 2019). The prison-employee defendants must demonstrate that the inmate failed to exhaust the on-the-books remedies. *Id.* If the defendants can make that showing, then the inmate plaintiff must show that the on-the-books remedies were unavailable to him or her. *Id.*

As to the first stage, it is undisputed that West did not exhaust the on-the-books remedies required by DDOC. Under DDOC Policy 4.4, a prisoner must file a grievance on "form #584"

11

within seven days of an incident. (D.I. 86 at A-51). West concedes that, while he "made attempts to file grievances . . . he was prevented from so filing." (D.I. 90 ¶ 11).

The remaining issue is whether West could have completed a grievance form within the time period prescribed by DDOC Policy 4.4 – seven days. West alleged in his Complaint that he had exhausted all administrative remedies because he tried to file a grievance twice but was denied, first for being on PCO status and then "for time." (D.I. 1 at 2). West now argues that he was unable to file a grievance pursuant to DDOC Policy 4.4 because inmates on PCO status are not allowed access to pens or pencils. (D.I. 88 at 12-13). It is undisputed that inmates on PCO Level I or Level II status do not have access to pens or pencils,[2] (D.I. 86 at A-161), and that there were periods of time when West did not have a mattress, (*see, e.g.*, D.I. 86 at A-10).

When considering this Court's prior decision on this issue, the Third Circuit noted that the three most common circumstances in which an administrative remedy is unavailable[3] are exemplary, rather than comprehensive and held that "[u]nder the highly unusual facts here, . . . if West lacked the ability to complete the required written grievance form, the prison's administrative remedy was not within his capability to use to obtain relief, and therefore was unavailable to him." *West*, 787 F. App'x at 815. The Third Circuit went on to hold that, on the then-existing factual record which lacked precise dates identifying the deprivations of the mattress and pen, there

---

[2] Inmates on PCO Level III status are permitted pens and pencils, although they must be removed when not in use. (D.I. 86 at A-161).

[3] Ordinarily, an administrative remedy is unavailable where "(1) despite what regulations or guidance materials may promise, it operates as a simple dead end with officers unable or consistently unwilling to provide any relief to aggrieved inmates; (2) an administrative scheme is so opaque that it becomes incapable of use; or (3) when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Resop v. Deallie*, C.A. No. 15-626 (LPS), 2017 WL 3586863 at *2 (D. Del. Aug. 18, 2017) (citing *Ross*, 136 S. Ct. at 1859-60).

remained a disputed factual issue: "whether, within seven days of being deprived of a mattress, West had access to either a pen or another means of completing the written grievance form." *Id.*

The Court finds that on the current factual record, this issue remains unresolved. Defendants have submitted West's housing reports, (D.I. 86, Exs. H, I), which they contend show several windows in the relevant time periods of September 2011 to February 2012 and April to June 2013 during which West was either on PCO Level III status or not on PCO at all. (D.I. 85 at 10; D.I. 92 at 6). Defendants argue that, because inmates on PCO Level III status or in the general population have access to pens, West could have filed a grievance form during one of these windows. (D.I. 85 at 10; D.I. 92 at 6). First, this is not entirely clear; Katrina Burley testified that "If [inmates] were with clothes, they could have an ink pen. But I know specifically Mr. West could not have ink pens because he was swallowing them." (D.I. 89 at A-56). This suggests that West may have been subject to even more stringent restrictions on writing utensils than other inmates. Even assuming that West had access to a pen during each of the time periods suggested by Defendants, however, it is still unclear whether one of those time periods was within seven days of the deprivation of a mattress. As discussed above, there are significant disputes as to the dates and length of West's mattress deprivation. Thus, the Court is not prepared at this stage to say that West could have submitted a grievance form within seven days of a mattress deprivation, as required by DDOC policies.

To the extent that Defendants may argue that West should have completed a grievance form while he was in the general population even if it had been more than seven days since a mattress deprivation, such action would have gone beyond the grievance policies "officially on the books" in DDOC policy, and West was not obligated to do so. *West*, 787 Fed. App'x at 815-16.

Thus, Defendants' motion for summary judgment on this ground will be denied.

13

### D. Eleventh Amendment

The Eleventh Amendment of the United States Constitution protects an unconsenting state or state agency from a suit brought in federal court by one of its own citizens, regardless of the relief sought. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984); *Edelman v. Jordan*, 415 U.S. 651 (1974). Further, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (internal citations omitted). Accordingly, § 1983 claims for monetary damages against a state, state agency, or a state official in his official capacity are barred by the Eleventh Amendment so long as the state did not waive its immunity. *See Ali v. Howard*, 353 F. App'x 667, 672 (3d Cir. 2009).

First, it is unclear whether West intended to sue Defendants in both their individual and official capacities. The Complaint lists the defendants by name and job title, (D.I. 1 at 2), which the Third Circuit has suggested may indicate an intent to sue state officials in both capacities, *Ali*, 353 F. App'x at 672. In any case, West does not argue, and there is nothing to suggest, that the State of Delaware has waived its sovereign immunity with regard to lawsuits of this type. Thus, to the extent that West intended to sue Defendants for damages in their official capacities, such claims are barred by the Eleventh Amendment.

## IV. CONCLUSION

For the foregoing reasons, the Court will grant Defendants' motion as to any claims asserted against them in their official capacities and will deny the motion in all other respects. An appropriate order will follow.