# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

CHRISTOPHER H. WEST,

           Plaintiff,

   v.

MARK EMIG and
JEFFREY CARROTHERS,

           Defendants.

C.A. No. 13-2103-JLH

## MEMORANDUM OPINION

Stephen A. Hampton, GRADY & HAMPTON, LLC, Dover, Delaware; Joseph A. Ratasiewicz, CASAMENTO & RATASIEWICZ, P.C., Media, PA – Attorneys for Plaintiff.

Nicholas D. Picollelli, Jr., Kenneth L. Wan, Deputy Attorneys General, DELAWARE DEPARTMENT OF JUSTICE, Wilmington, DE – Attorneys for Defendant.

October 24, 2022
Wilmington, Delaware

*[signature]*

**JENNIFER L. HALL, U.S. MAGISTRATE JUDGE**

Plaintiff Christopher H. West, an inmate at the James T. Vaughn Correctional Center ("JTVCC"), commenced this action on December 30, 2013, pursuant to 42 U.S.C. § 1983. (D.I. 1.) He alleges that Defendants Mark Emig and Jeffrey Carrothers each subjected him to cruel and unusual punishment in violation of the Eighth Amendment by depriving him of a mattress for certain periods between 2011 and 2013. (*Id.*)

The Court held a bench trial on April 11, 2022.[1] (D.I. 131, Ex. 2 ("Tr. __").) Post-trial briefing is complete. (D.I. 129, 131, 132.) Pursuant to Federal Rule of Civil Procedure 52(a), the following are the Court's findings of fact and conclusions of law.

## I. FINDINGS OF FACT[2]

1. Mr. West has a long history of swallowing non-edible items. (JTX 17 at 2.) Such behavior increased in frequency during his periods of incarceration. (*Id.*) Between 2011 and 2013, while he was incarcerated at Howard R. Young Correctional Institution ("HRYCI") and JTVCC, Mr. West swallowed or tried to swallow at least thirty non-edible items, including staples, pens, pencils, plastic straws, screws, paperclips, batteries, the tiles from his prison cell, a spork, a zipper from his mattress, and the foam from his mattress. (D.I. 122 (Pre-Trial Order ("PTO")) ¶¶ 9, 11;

---

[1] After the District Judge denied-in-part Defendant's motion for summary judgment (D.I. 96), the parties consented to have a Magistrate Judge conduct further proceedings in the case, including trial. (D.I. 115.) The parties also consented to a bench trial. (D.I. 112.)

[2] The following are the Court's findings of fact. In determining the credibility of the witnesses, the Court has taken into account the rationality and internal consistency of the witness's testimony, the extent of detail and coherent nature of the testimony, the manner of testifying by the witnesses, and the degree to which the subject testimony is consistent or inconsistent with other evidence in the case. Moreover, the Court has drawn such reasonable inferences from the credible direct and circumstantial evidence as is permitted by reason and common sense.

Tr. 7, 26–28, 32–33, 81, 84–86, 88–89, 91–92, 105–09, 130; JTX 17 at 2–4.)  Mr. West has provided various explanations for his behavior while in prison, including a desire to be taken to the hospital to obtain pain medication, avoiding incarceration, getting attention, an attempt to "manipulate the system," and auditory hallucinations to kill himself.  (JTX at 3–4; Tr. 83, 90, 112–113, 115–17.)

    2.    Mr. West was an inmate at HRYCI in Wilmington, Delaware between July 2011 and February 2012.  (PTO ¶ 9; JTX 17 at 1; Tr. 81.)  Mr. Emig was the Deputy Warden of HRYCI during that time.  (PTO ¶ 8.)  Between July and December 2011, Mr. West ate or reported eating non-edible objects on at least seventeen different occasions, resulting in eight outside hospital trips.[3]  In September 2011, after Mr. West was hospitalized for eating part of his mattress, HRYCI

---

[3] Within days of arriving at HRYCI, Mr. West reported that he had swallowed a paper clip. (JTX 17 at 3.)  On July 8, 2011, he was taken to the hospital, where it was surgically removed. While at the hospital, he ate a spork.  (*Id.*)  On July 18, 2011, he reported that he had swallowed a pen and was returned to the hospital.  (*Id.*)  While at the hospital, he attempted to swallow a pen. (*Id.*)  On August 2, 2011, he reported that he swallowed a pencil and screws, and he was returned to the hospital.  (*Id.*)  Medical providers performed an endoscopy and recovered the pencil as well as a shoestring with metallic rings.  (*Id.*)  While still at the hospital, he ingested two batteries from a heart monitor and a writing object from a nurse's cart.  (*Id.*; Tr. 32–33, 50.)  On August 12, 2011, he reported that he ingested a pen at the courthouse; it was later determined that he fabricated the story.  (JTX 17 at 3.)  On August 13, 2011, he ingested a piece of foam from a suicide-resistant mattress and a spork, and he was brought by ambulance to the hospital.  (*Id.*; Tr. 32–33, 84–85.) On October 14, 2011, he swallowed more than one spork, a pen, and a pencil.  He was sent to the hospital, where providers performed a laparoscopic procedure and removed nine foreign bodies. (JTX 17 at 3.)  On October 22, he reported that he swallowed pens, pencils, and a spork the day before.  (*Id.* at 4.)  On October 25, 2011, he ingested tiles from the floor of his cell and was sent to the hospital.  (*Id.*; Tr. 33, 50–51.)  He returned to prison on October 27 but he went back to the hospital after he pulled out his catheter and ate it.  (JTX 17 at 4.)  On October 28, 2011, he ingested a bottle opener.  He spoke to his mother a few days later and told her that his ingestion of objects was an attempt to "manipulate the system."  (*Id.*)  On November 13, 2011, while in prison, he ate a plastic cup.  (*Id.*)  On November 23, he reported that he inserted something into his penis and ingested a pencil.  (*Id.*)  An on-site ultrasound was completed but there was no evidence that he had ingested a foreign body.  (*Id.*)  He asked to go to the hospital multiple times because he did not want to spend Thanksgiving in prison; instead, providers performed a procedure at HRYCI to remove what appeared to be a piece of rice and a small piece of concrete from his penis.  (*Id.*)  On

mental health staff determined that it should be removed from his cell for his own safety. (Tr. 10–13, 26–27, 84–85.) Mr. Emig's security officers removed Mr. West's mattress in accordance with the determination of mental health staff. (Tr. 12, 31–32.)

3. The parties dispute whether Mr. West was ever without a mattress at night at HRYCI and, if so, how long. They also dispute whether Mr. Emig knew that Mr. West was without a mattress at night and, if so, whether he knew how long. At trial, Mr. Emig testified that, at some point, the mental health unit informed him that they had decided that the mattress should be removed from Mr. West's cell for his own safety, but Emig could not recall the details about when that occurred or for how long, or if the mattress was returned at night. (Tr. 10, 20–21, 24–29, 30, 33, 36, 41.) Mr. Waltz, a Correctional Officer at HRYCI, testified that he didn't see a mattress in West's cell for a period of "a month or so" after he had ripped his mattress open and swallowed the stuffing. (Tr. 45–46, 50, 54.) However, Mr. Waltz worked the daytime shift, and he "c[ouldn't] say" if West was given a mattress at night during that time. (Tr. 51–53.) Mr. West testified that he was deprived of a mattress, including at night, for two periods of time: for one month starting in September (after he swallowed mattress foam); and again for two-and-a-half months between mid-October 2011 (after he swallowed additional items) and January 2012. (Tr. 84–86, 96.) Mr. West further testified that, without the mattress, he slept with a blanket at night on the floor of his cell, which first consisted of tile and, later, concrete.[4] (Tr. 91.) West also testified that he personally asked Emig to return his mattress. (Tr. 88–89, 99.)

---

November 24, 2011 (Thanksgiving Day), he reported that he had ingested a pen and toilet paper, but all items were accounted for and he remained at HRYCI. (*Id*.) When prison staff stopped taking West to the hospital absent evidence that he'd actually swallowed something inedible, he stopped making false reports of swallowing. (Tr. 112–17; JTX 17 at 3–4.)

[4] Prison staff removed the tiles from Mr. West's cell after he ate them. (Tr. 90–91.) Staff also removed the screws from the outlets, toilet, and windows so he couldn't eat them. (Tr. 51.)

4. The Court only partially credits Mr. West's testimony. The Court finds by a preponderance of the evidence that West lacked a mattress at night at HRYCI for at least some period of time, which was, at most, approximately one month. The only evidence that Mr. West was deprived of a mattress for longer is his own testimony, which is not entirely credible. West's memories from that time period were "fuzzy"; indeed, by his own admission, he lacked "awareness" and had hallucinations around the same time he says he lacked a mattress. (Tr. 95–96, 106, 119.) Mr. West testified that "the time would kind of blur," and he could only "piece [] together" the sequence of events at HRYCI after reviewing records from his Superior Court criminal case, which, he says, refreshed his recollection about "what was going on with [him] based on those dates." (Tr. 108–110, 119–20.) (He did not present those records at trial.) Although Mr. West testified that he complained to prison medical staff about pain from sleeping on the floor, he presented no medical records documenting any such complaints. (Tr. 111.) Nor are there records documenting any injuries from sleeping on the floor. Further, Mr. West's testimony that he was forced to sleep on the floor for two-and-a-half months between mid-October 2011 and January 2012 is inconsistent with other evidence of record, including records documenting that he was in the hospital in late October, documentary evidence suggesting that he had at least a plastic sleeping boat for some of the time that he claims he was forced to sleep on the floor, and medical records from various points during that time period where he reported sleep "within normal limits." (JTX 19; JTX 28; JTX 29; JTX 17 at 3–4; JTX 32; Tr. 48–49.)

5. The evidence of record, including evidence that Mr. Emig was being updated about West during the time he was at HRYCI, permits a reasonable inference that Emig knew that West lacked a mattress at night for at least some period of time; however, the evidence of record is

insufficient to establish by a preponderance of the evidence that Emig knew that West was without a mattress for a month or longer. (Tr. 10–13, 18, 20, 26–28, 87–90.)

6.  The Court finds that, during the times when the mattress was removed from Mr. West's cell, it was not because Mr. Emig was punishing West or indifferent to his well-being. (Tr. 33, 41.) HRYCI staff had never encountered an inmate with such a serious, ongoing ingesting issue, and they were unsure about how to handle an inmate who was eating just about everything he could get his hands on. (Tr. 37, 88, 104–105.) Mr. Emig was concerned about Mr. West's safety during his stay at HRYCI and, at one point, Emig even called West's mother. (Tr. 9–10, 87; JTX 27.) In December 2011, West was referred to a psychologist for a behavioral management consultation, and she concluded that West's "choice to ingest or insert foreign objects [wa]s an attempt to avoid incarceration and not due to a major mental illness" and that his behavior was "reinforced by [West] receiving pain medication." (JTX 17 at 4; *id.* at 2 (psychological evaluation noting that West "endorsed certain combinations of features that are atypical or unusual in clinical populations, but which tend to be common amongst individuals feigning mental disorder").) Prison staff took Mr. West to the hospital multiple times for care after he reported eating objects. And when West returned to HRYCI, the staff kept him on Psychological Close Observation ("PCO") for his own safety, where he was monitored closely (sometimes one-on-one) for twenty-four hours a day. (Tr. 8–11, 13–16, 47–49, 107–108, 120–22; JTX 17 at 2–4; JTX 20; JTX 22.) But even continuous one-on-one observation did not prevent Mr. West from ripping open a suicide-resistant (non-rip) mattress, swallowing part of it, and sending himself back to the hospital. (Tr. 32–33, 121–22.) The mattress was subsequently removed from West's cell for some period (or periods) of time, but it was not as a punishment; rather, it was based upon the recommendation and decision of the mental health staff. (Tr. 11–13, 33, 41.) Having considered all of the evidence

6

of record, the Court concludes that Mr. West's treatment at HRYCI was inconsistent with a finding that any HRYCI staff were indifferent to Mr. West's medical needs or well-being.

7. In April 2013, Mr. West was transferred to JTVCC. At that time, Defendant Carrothers was the Security Superintendent. (PTO ¶¶ 10–11; Tr. 57.) Mr. West was initially provided a mattress at JTVCC. (Tr. 96–97.) At some point after his arrival, he started swallowing items again, including a pen. (PTO ¶ 11; Tr. 63–64, 72–73, 97.) He also tried to swallow the zipper from his mattress. (Tr. 130.) He was again placed on PCO, and for some period of time he was on PCO Level I. (Tr. 58, 63.) Pursuant to JTVCC practice, inmates on PCO Level I had their mattresses removed in the morning and returned to them in the evening. (Tr. 61, 66, 72–73 (explaining that the daytime mattress restriction prevented inmates from using their mattress to block the windows used to observe them), 131–32, 134.)

8. Mr. West has not demonstrated by a preponderance of the evidence that he was ever deprived of a mattress for longer than 16 hours at JTVCC or that he spent a single night without a mattress at JTVCC. The only evidence that Mr. West lacked a mattress at night is his own testimony that he slept on the floor for a three-month period from April to June 2012 (Tr. 97, 102, 110), which I do not credit for multiple reasons, including that it is inconsistent with contemporaneous documentary evidence suggesting that he was sleeping well and had a bed. (JTX 4; JTX 7; JTX 12; JTX 14.) And although Mr. West testified that he complained to medical staff about pain from sleeping on the floor, he presented no records documenting any such complaints or injuries. (Tr. 111–112.)

9. The Court finds that JTVCC staff did not remove the mattress from Mr. West's cell during the daytime hours to punish him; rather, it was for legitimate penological reasons, including

West's safety.  The Court further finds that Mr. Carrothers was not indifferent to Mr. West's health or well-being.

## II.     CONCLUSIONS OF LAW

10.     The Eighth Amendment ban on cruel and unusual punishment requires prison officials to provide humane conditions of confinement to incarcerated persons.  *Farmer v. Brennan*, 511 U.S. 825, 833 (1994).  To prove an Eighth Amendment violation based on an alleged deprivation, a prisoner must establish that (1) the deprivation was "objectively, sufficiently serious; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities; and (2) the prison official must have been deliberately indifferent to inmate health or safety." *Porter v. Pa. Dep't of Corrs.*, 974 F.3d 431, 441 (3d Cir. 2020) (cleaned up) (citing *Farmer*, 511 U.S. at 834).  An official is "deliberately indifferent" if he "knows of and disregards an excessive risk to inmate health or safety." *Id.* (citing *Farmer*, 511 U.S. at 837); *Farmer*, 511 U.S. at 834 ("To violate the Cruel and Unusual Punishments Clause, a prison official must have a 'sufficiently culpable state of mind.'" (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).

11.     "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Taylor v. Barkes*, 575 U.S. 822, 825 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* "When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 743 (2011)).  There is no requirement that the plaintiff identify "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*  "[C]ourts may grant

8

qualified immunity on the ground that a purported right was not 'clearly established' by prior case law, without resolving the often more difficult question whether the purported right exists at all." *Reichle,* 566 U.S. at 664.

12.     Mr. Emig is entitled to qualified immunity. Mr. West has not identified a Supreme Court or Third Circuit case (or any other case) preceding the alleged deprivation that says that prison officials cannot deprive a prisoner of a mattress at night for a period of less than one month on the advice of mental health professionals and with the intent and purpose of protecting the prisoner (including by preventing him from harming himself by eating the mattress).[5] No precedent on the books in 2011 to 2012 would have made clear to Mr. Emig that he was violating the Constitution with respect to Mr. West. In short, the Court cannot say that only someone "plainly incompetent" or who "knowingly violate[d] the law" would have acted as Emig did. *Ashcroft*, 563 U.S. at 743.

13.     Mr. Carrothers is also entitled to qualified immunity. Mr. West has not identified a Supreme Court or Third Circuit case (or any other case) preceding the alleged deprivation that says that prison officials cannot remove a mattress from a prisoner's cell during the daytime hours for legitimate penological reasons, including to protect prisoners who required psychological close observation. No precedent on the books in 2013 would have made clear to Mr. Carrothers that he was violating the Constitution with respect to Mr. West. Again, the Court cannot say that only

---

[5] Mr. West cites *Mammana v. Federal Bureau of Prisons*, 934 F.3d 368 (3d Cir. 2019), and *McClure v. Haste*, 820 Fed. App'x 125 (3d Cir. 2020), but those cases postdate the alleged constitutional violations here. Regardless, both of those cases leave open the possibility that a mattress might constitutionally be withheld when there is an adequate penological justification. Certainly, neither case says that the Constitution prevents a prison official from withholding a mattress from a prisoner for less than a month to prevent him from harming himself by eating it. Unlike in *McClure*, where the inmate's "misconduct was completely unrelated to the mattress restriction," 820 F. App'x at 131, here the mattress restriction was directly related to Mr. West's self-harming behavior.

someone "plainly incompetent" or who "knowingly violate[d] the law" would have acted as Carrothers did. *Id.*

14. In addition, Mr. West has not established an Eighth Amendment violation for at least the reason that neither Defendant acted with a culpable state of mind or with deliberate indifference to Mr. West's health or safety. Prison officials had a clear need to prevent West from harming himself. The short-term removals of his mattress were intended to protect his health and safety and were not unreasonable courses of action under the circumstances confronting Defendants. *Farmer*, 511 U.S. at 845 ("[P]rison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.").

### III. CONCLUSION

For the above reasons, the Court finds that Defendants are entitled to qualified immunity. The Court further finds that Plaintiff has not met his burden to establish an Eighth Amendment violation.